IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


ILENE REED,
     Plaintiff,

v.                              Case No.  5:09cv237/RS/EMT

GULF COAST COMMUNITY COLLEGE,
     Defendant.
_____/

## ORDER, REPORT AND RECOMMENDATION

      This cause filed pro se by Plaintiff Ilene Reed ("Reed") pursuant to Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), is before the court upon the motion
for summary judgment filed by Defendant Gulf Coast Community College ("GCCC") (Doc. 16).
Also pending is GCCC's motion to strike (Doc. 30) Reed's response to the motion for summary
judgment, statement of undisputed material facts, and exhibits (Docs. 26, 27, 28). As set forth
below, the court denies GCCC's motion to strike. It also recommends that GCCC's motion for
summary judgment be granted.

## I.      PROCEDURAL HISTORY

      Reed—who is female—filed a complaint of gender discrimination against GCCC with the
Equal Employment Opportunity Commission ("EEOC"). The EEOC dismissed Reed's complaint,
closing its file and sending her notice of her right to bring suit in federal court. This action followed
by Reed's filing a complaint in state court (*see* Doc. 2, attached Complaint). GCCC filed a petition
for removal asserting that this court has original jurisdiction by virtue of the existence of a federal
question, pursuant to 28 U.S.C. § 1331; thus, the action may be removed to this federal court
pursuant to 28 U.S.C. § 1441 (Doc. 2). Reed does not contest jurisdiction, and the court finds a
sufficient basis for removal. The case was referred to the undersigned for the issuance of all

preliminary orders and a recommendation to the district court regarding dispositive motions. *See* N.D. Fla. Loc. R. 72.2(E); *see also* 28 U.S.C.§ 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b).

Reed alleges in her complaint that GCCC discriminated against her on the basis of her gender when GCCC management failed to investigate and take effective corrective action when she complained of sexual harassment and battery by her supervisor (Doc. 2, attached Complaint).[1] Reed also alleges she was constructively discharged (*id.*). As relief, Reed seeks compensatory damages (*id.*).

On December 18, 2009, GCCC filed its motion for summary judgment (Doc. 16), along with a statement of undisputed facts (Doc. 17), supporting memorandum (Doc. 18), and summary judgment materials (Doc. 19), which it contends show there is an absence of evidence of discrimination. The court issued an advisement order informing the parties of the importance and ramifications of summary judgment consideration and provided them with information as to the requirements for materials submitted for Rule 56 review (Doc. 21). Reed filed a response to the motion for summary judgment (Doc. 26), a statement of undisputed facts (Doc. 27), and exhibits (Doc. 28). GCCC then filed its motion to strike Reed's response, statement of undisputed facts, and exhibits as untimely (Doc. 30). Reed responded in opposition to the motion to strike (Doc. 31).

II.     MOTION TO STRIKE

In its motion to strike, GCCC asserts that the court should strike Reed's response to the motion for summary judgment, statement of undisputed facts, and exhibits because Reed filed the documents on February 16, 2010, four days (but only one business day) after the February 12 deadline established by the court (Docs. 24, 26–28, 30). GCCC argues it has been prejudiced by Reed's late filings and procedural errors throughout this proceeding and the underlying

---

[1] Reed's complaint also includes two general references to discrimination "because of his race and color" (*see* Doc. 2, attached Complaint, ¶¶ 2, 13). However, these references were made in general jurisdictional statements and appear to have been included in error, since they refer to Plaintiff by male pronouns and because the complaint expressly includes only one count titled "Gender Discrimination," which specifically describes only gender-based harassment (*id.*, ¶¶ 15–27). Additionally, Reed stated in her deposition that her claims in this lawsuit were limited to sexual harassment (Doc. 19-73, Ex. D, Deposition of Ilene Reed, 54:2–57:19).

The court also notes that although Reed claimed retaliation in her EEOC charge, she did not raise a claim of retaliation in her complaint before this court (*see* Doc. 2, attached Complaint).

administrative proceedings, but it does not describe this prejudice with any particularity (Doc. 30 at 4).

In Reed's response in opposition to the motion to strike, Reed states she was unable to find anyone to type her materials until the afternoon of February 12, 2010 (Doc. 31, ¶ 2). She further states that after she found someone to type the materials, she had only twenty (20) minutes to take the materials to a Federal Express office by the time it closed at 6:00 p.m. (*id.*). Reed states that due to an extraordinary winter storm, she did not arrive at the Federal Express office until 6:05 p.m., after it closed (*id.*). Reed states she returned to the Federal Express office the next morning (a Saturday) and sent her materials to the court (*id.*). Because February 15, 2010, was a federal holiday, Reed's submissions were not docketed by the clerk of court until February 16, 2010 (*see* Docs. 26, 27, 28). Reed acknowledges that her materials would not have been docketed by the clerk until February 16, 2010, regardless of whether she sent them February 12 or February 13 (Doc. 31, ¶ 3).

Pro se litigants are required to follow the same procedural rules as other litigants, a standard which the court applies to Reed. *See* Moon v. Newsome, 863 F.2d 835, 837 (11th Cir. 1989). *See also* Wayne v. Jarvis, 197 F.3d 1098, 1104 (11th Cir. 1999); GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998). However, the court is required to construe her pleadings liberally. Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972). In the instant case, although Reed did not file a motion to extend the February 12 deadline for filing a response to GCCC's motion for summary judgment, she argued in her response to the motion to strike that her late filing was due to excusable neglect. Therefore, the court liberally construes her response as incorporating a belated request to extend the February 12 deadline.

Motions to extend the time for completing an act are governed by Rule 6(b) of the Federal Rules of Civil Procedure. That Rule permits a party to file late if the party establishes excusable neglect for its tardiness. Fed. R. Civ. P. 6(b)(1)(B). In Pioneer v. Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, 507 U.S. 380, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993), the Supreme Court held that when analyzing a claim of excusable neglect, courts should "tak[e] account of all relevant circumstances surrounding the party's omission," including "the danger of prejudice to the [nonmovant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the

movant acted in good faith." *Id.* at 395. "Primary importance should be accorded to the absence of prejudice to the nonmoving party and to the interest of efficient judicial administration." Advanced Estimating System, Inc. v. Riney, 77 F.3d 1322, 1325 (11th Cir. 1996) (citation omitted).

"[A]lthough inadvertence, ignorance of the rules or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." Pioneer Inv. Servs. Co., 507 U.S. at 392; *see also* Connecticut State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1356 (11th Cir. 2009) (an attorney's misinterpretation of the law does not constitute excusable neglect) (citing Advanced Estimating Sys., Inc., 130 F.3d at 998 (holding that "attorney's misunderstanding of the plain language of a [court] rule cannot constitute excusable neglect such that a party is relieved of the consequences of failing to comply with a statutory deadline") and Cavaliere v. Allstate Ins. Co., 996 F.2d 1111, 1115 (11th Cir. 1993) (concluding that the district court did not abuse its discretion in denying the plaintiff's motion where counsel's interpretation of Fed. R. Civ. P 6(e) was contrary to case law)). As previously noted, "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed," *see* Boxer X v. Harris, 437 F.3d 1107, 1110 (11th Cir. 2006); however, even pro se pleadings must adhere to time requirements. *See* Garvey v. Vaughn, 993 F.2d 776, 780 (11th Cir. 1993).

In the instant case, it is apparent that Reed failed to read or understand Rule 5 of the Federal Rules of Civil Procedure regarding the definition of "filing." Rule 5 provides, in relevant part, that a paper is filed by delivering it to the clerk *See* Fed. R. Civ. P. 5(d)(2)(A). In the instant case, the court explicitly set the deadline for Reed's summary judgment response as February 12, 2010 (*see* Doc. 24). Reed does not assert that she intended or attempted to deliver her summary judgment materials to the clerk of court prior to closing of the clerk's office on February 12 (see Doc. 31). Instead, she states she attempted to deliver her materials to the office of a delivery service (Federal Express) prior to that office's closing on February 12, 2010 (*id.* at 2). Indeed, Reed acknowledges that regardless of whether she delivered her materials to the Federal Express office on February 12 or February 13, the court would not have received them before February 16, 2010 (in light of the three-day holiday weekend). It is thus apparent that Reed misunderstood the procedural rules and believed her materials were deemed "filed" on the date the materials were delivered to a delivery

service, instead of the date they were delivered to the clerk.  Because Reed's error was a misunderstanding of the law, and not a mistake of fact, her error does not appear to constitute excusable neglect.  *See* Cordel v. Pacific Indem. Co., 335 Fed. Appx. 956, 960 (11th Cir. 2009) (unpublished) (pro se plaintiffs' misinterpretation of procedural rules with respect to time to appeal did not constitute excusable neglect).[2]

However, Reed's late filing by only one business day did not prejudice GCCC or the court's interest in efficient judicial administration.  Moreover, since "disposition of a case on summary judgment grounds represents a final adjudication on the merits," *see* Griffith v. Wainwright, 772 F.2d 822, 825 n. 4 (11th Cir. 1985), and given the "incessant command of the court's conscience that justice be done in light of *all* of the facts," *see* Johnson v. Pullman, Inc., 845 F.2d 911, 914 (11th Cir. 1988) (citations omitted) (emphasis in original), the court will give Reed "[her] day in court," *see* Glover v. City of Pensacola, No. 09-124502010, 2010 WL 1461570, at *3 (11th Cir. Apr. 14, 2010), by considering her responsive materials.  Therefore, the court will deny GCCC's motion to strike.

## III.    MATERIAL FACTS

The following facts are viewed in the light most favorable to Reed or, except as noted, are undisputed.[3]  Reed worked for GCCC as a custodian from approximately September of 1998 to

---

[2] In this Report, the undersigned cites unpublished Eleventh Circuit cases only as persuasive authority and recognizes that the opinions are not considered binding precedent.  *See* 11th Cir. R. 36-2.

[3] As this case comes before the court on GCCC's motion for summary judgment, the court views the facts in the light most favorable to Reed as the non-moving party, *see* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993), drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  *See* Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

With regard to the pleadings and evidentiary materials on file, the court makes four observations.  First, any facts included in GCCC's statement of undisputed material facts that are not controverted by Reed's statement of facts are deemed admitted.  *See* N.D. Fla. Loc. R. 56.1(A) (all material facts set forth in moving party's statement of undisputed material facts will be deemed admitted unless controverted by statement required to be filed and served by opposing party).  Second, any statements of fact asserted by Reed in her complaint and the statements included in her statement of undisputed facts and response to the motion for summary judgment may not be considered summary judgment evidence because none of those documents are verified.  However, the Amended Charge of Discrimination "dual-filed" by Reed with the Florida Commission on Human Rights ("FCHR") and the EEOC on March 7, 2003, which she signed under penalty of perjury, is admissible to the extent her statements therein are based on her personal knowledge and set out facts admissible at trial (Doc. 28-2, Ex. A at 16; Doc. 19, Ex. E).  Third, Rule 56.1 of the Local Rules for the Northern District of Florida requires each party's statement of material facts to reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied-upon material fact, by page, paragraph,

February 9, 2001 (Doc. 2, attached Complaint ¶¶ 6, 18; Doc. 17, ¶ 11; Doc. 27, ¶ 1). GCCC has a sexual harassment policy in place which is published to employees each year by including a written brochure in materials distributed to them at an annual meeting (Doc. 19-3, Ex. C, Florida Division of Administrative Hearings Transcript ("FDAH") vol. 1, 195–96, Apr. 13, 2004; Doc. 19-12, Ex. I). The policy provides that employees should report sexual harassment complaints to their immediate supervisor, department head, human resources director, dean, or vice president of administrative services (Doc. 19-12, Ex. I). In September of 1999, John Holdnak, Director of Human Resources, became aware of a complaint by Reed to her supervisor, Tom Krampota, that she was being sexually harassed by Willie Stephens,[4] a lead custodian, by Stephens' taking unauthorized photographs of her "from behind" (Doc. 17, ¶¶ 11, 13; Doc. 19-3, Ex. C, FDAH Tr. vol. 1, 9, 74–75, 91, 187, Apr. 13, 2004). Prior to this complaint about Stephens, Reed had brought a complaint to Holdnak of racial discrimination involving another employee (Doc. 19-3, Ex. C, FDAH Tr. vol. 1, 74–75, 91, 179–80, 195–95, Apr. 13, 2004).

---

number, or other detail sufficient to permit the court to readily locate and check the source. N.D. Fla. Loc. R. 56.1(A). Included in Reed's evidentiary submissions is an authenticated copy of the entire file of the FCHR (Doc. 28, Ex. A); however, Reed references only a few of those documents in her response to GCCC's motion and in her statement of material facts (*see* Docs. 26, 27). While the court recognizes its obligation to liberally construe Reed's pleadings, this obligation does not extend to looking beyond her specific references to the record and culling through a stack of unreferenced documents to weed out evidence that may support her position. Finally, while the documents submitted by Reed which are part of the FCHR file are properly authenticated, the documents are rife with out-of-court statements offered by Reed to prove the truth of the matter asserted. Statements of GCCC employees made during their employment with GCCC and concerning matters within the scope of their employment do not constitute hearsay and are admissible on summary judgment. *See* Fed. R. Civ. P. 801(d)(2)(D); City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 557–58 (11th Cir. 1998); Miles v. M.N.C. Corp., 750 F.2d 867, 873–75 (11th Cir. 1985) (in plaintiff's Title VII suit against employer, nature of supervisory positions held by declarant determined admissibility of evidence of alleged racial slur as vicarious admission of employer); *see also* Brown v. Metropolitan Atlanta Rapid Transit Authority, 261 Fed. Appx. 167, 173 n.7 (11th Cir. 2008) (unpublished); Horne v. Turner Const. Co., 136 Fed. Appx. 289, 292, 2005 WL 1444180, at *3 (11th Cir. 2005) (unpublished). However, statements of low-level co-workers of Reed may not be attributable to GCCC as admissions because Reed has offered no evidence to suggest that the co-workers were involved in the employment decisions at issue or were speaking as to a matter within the scope of their employment. Furthermore, any statements by Reed included in the documents and offered by Reed for the truth of the matter asserted may not be offered by Reed to support her position, since those statements constitute hearsay.

[4] Willie Stephens is referred to as "Stevenson" in GCCC's summary judgment submissions, Reed's Amended Charge of Discrimination filed with the EEOC, and much of the evidentiary material submitted by the parties. However, the "last chance" agreement referenced *infra* confirms that his surname is Stephens; therefore, he will be referred to as "Stephens" in this Report (*see* Doc. 28-2, Ex. A at 122).

Upon receiving Reed's complaint regarding Stephens, Holdnak immediately initiated an investigation (Doc. 17, ¶ 13; Doc. 19-4, Ex. C, FDAH Tr. vol. 1, 188, Apr. 13, 2004). Holdnak interviewed all of the people who Reed indicated had knowledge of her allegations (Doc. 19-4, Ex. C, FDAH Tr. vol. 1, 188, Apr. 13, 2004). Holdnak also interviewed Willie Stephens (*id.*). Holdnak asked Mr. Stephens to deliver to him the pictures he took of Reed (*id.*). Holdnak viewed the pictures provided by Mr. Stephens, and he determined that all of them were photographs of Reed at work while she was working or sitting, and some of them appeared to be unauthorized (*id.*, 189–91). Holdnak testified that he would not characterize any of the photographs as indecent (*id.*, 189–90). Holdnak testified that he met with Reed and asked her what action she desired as a result of her complaint, and Reed stated she did not want Stephens to lose his job, she just wanted him to stop taking pictures of her and "leave her alone" (*id.*, 191). Reed testified to a slightly different version of her conversation with Holdnak; she testified that she initially told Holdnak she believed Stephens should be fired, but then told him she would be satisfied as long as Stephens was not permitted to be near her (Doc. 19-7, Reed Dep. 128:1–7, Nov. 16, 2009).

Upon conclusion of his investigation, Holdnak determined that Willie Stephens had in fact taken unauthorized photographs of Reed (Doc. 17, ¶ 14; Doc. 27, ¶ 9). Holdnak informed his supervisor, John Morris, Vice President of Administrative Services, in a memorandum dated September 10, 1999, that he and Mosell Washington "[were] able to confirm the essential components of Ms. Reed's complaint against Mr. Stephens." (Doc. 19-5, FDAH Tr. vol. 1, 191, Apr. 13, 2004; Doc. 27, ¶ 9; Doc. 28-2, Ex. A at 120–21). Holdnak stated further, "It is our opinion that Mr. Stephens did, over a considerable period of time, create a hostile working environment for Ms. Reed." (Doc. 27, ¶ 9; Doc. 28-2, Ex. A at 120). Holdnak recommended that the following formal disciplinary actions be taken against Stephens: (1) demotion from Lead Custodian to Custodian, with a resulting decrease in pay in accordance with the college's salary schedule, (2) transfer to another building on campus where Stephens would have no contact with Reed unless in supervised group work, (3) forfeiture of Stephens' master key and issuance of a key to only his assigned duty area, (4) return of all photographs and negatives to Reed, (5) placement on probation for twelve months with informal evaluations every month and formal evaluations every six months, and (6) entering a "last chance" agreement with the college whereby Stephens must agree to the

aforementioned conditions and agree that he would be terminated if he ever brought a camera on campus or violated any college policies (*id.* at 121).

Holdnak testified that prior to Reed's complaint, he knew that Stephens had taken pictures on campus (Doc. 19-5, FDAH Tr. vol. 1, 199, Apr. 13, 2004), which pictures resulted in a sexual harassment claim by students against Stephens; specifically, Holdnak referenced Stephens' picture-taking history in the September 10, 1999, memorandum and enclosed documentation of a 1993 sexual harassment claim by students against Stephens (Doc. 27, ¶¶ 2, 6– 9; Doc. 28-2, Ex. A at 120–21, 124–28, 137–41). In determining the appropriate disciplinary action to take against Stephens with regard to Reed's complaint, Mr. Holdnak testified that he considered the fact that Stephens' misconduct did not involve merely making objectionable comments to a fellow employee, rather, it involved objectionable conduct (Doc. 19-4, Ex. C, Transcript of Hearing, vol. 1, 205–06, Apr. 13, 2004). Additionally, he considered the fact that Stephens had previously been accused of sexual harassment based upon picture-taking at GCCC and was told not to have a camera on campus (*id.*, 189, 199, 206). Mr. Holdnak did not recommend termination of Stephens' employment for two reasons: first, Reed had told him termination was not her desired outcome; second, Stephens had been employed at GCCC since 1978 or 1979, and had been a "fairly good" employee, with only one previous disciplinary incident (the previous picture-taking) (*id.*, 206).

John Morris and the President of the College approved Holdnak's recommendation on September 14, 1999 (Doc. 19-5, FDAH Tr. vol. 1, 191, Apr. 13, 2004; Doc. 27, ¶ 12; Doc. 28-2, Ex. A at 118).

On September 16, 1999, Stephens signed a "last chance" agreement whereby he agreed to the aforementioned conditions in order to continue his employment with GCCC (Doc. 17, ¶¶ 14–19; Doc. 19-5, FDAH Tr. vol. 1, 192–93, Apr. 13, 2004). Holdnak informed Reed of the disciplinary action taken against Stephens, and Reed signed a statement that she understood the actions the college had taken and was satisfied with them (Doc. 17, ¶ 20; Doc. 19-5, FDAH Tr. vol. 1, 194, Apr. 13, 2004; Doc. 19-7, Ex. D, Reed Dep. 128:10–20, 133:2:–134:9; Doc. 27, ¶ 10; Doc. 28-3, Ex. A at 159). Holdnak told Reed that Stephens had been told he could not contact her. Holdnak also told Reed that if she experienced any such conduct by Stephens, she should contact him (Holdnak) or Mosell Washington (Doc. 19-5, FDAH Tr. vol. 1, 194, Apr. 13, 2004).

Mosell Washington testified that he became Interim Director of Human Resources in the Fall of 1999, and became the permanent Director on July 1, 2000 (Doc. 19-5, FDAH Tr. vol. 1, 210, Apr. 13, 2004). Washington testified that he became aware of a more recent complaint of harassment by Reed on February 5, 2001, after Reed complained to the President of the College that Stephens had violated the terms of the "last chance" agreement. Holdnak assigned Washington to investigate Reed's complaint (Doc. 19-5, FDAH Tr. vol. 1, 196–97, 209, 214, Apr. 13, 2004). The nature of Reed's complaint was that on December 23, 2000, she was cleaning a building on the last day of classes prior to the Christmas break, and Stephens was in her building unsupervised (Doc. 17, ¶ 29; *see also* Doc. 19-5, FDAH Tr. vol. 1, 220, Apr. 13, 2004). Washington testified that prior to that date, Reed never complained to him about Stephens (Doc. 19-5, FDAH Tr. vol. 1, 210, Apr. 13, 2004). Washington testified that he met with Reed on February 6, 2001, and she expressed concern that Stephens was around her unsupervised (*id.*, 214–15). Reed told Washington that Stephens was in her building and that she had complained about it, but no one had done anything (*id.*, 215). Reed also mentioned an incident where Stephens and Lynwood Sherry (another custodial employee) were in her building (*id.*) (Reed told Washington that this incident occurred on January 24, 2001 (*see* Doc. 28-3, Ex. A at 180)). Reed further complained that Stephens, William (Bill) Barker (Stephens' replacement as lead custodian), and others were talking about her and looking at her, and Stephens would look at her with his mouth open (Doc. 19-5, FDAH Tr. vol. 1, 215, Apr. 13, 2004). Reed stated her belief that Stephens' unsupervised contact with her and his looking at her violated the conditions of the "last chance" agreement (*id.*). Washington told Reed he would investigate her complaint (*id.*).

Washington testified that during his investigation, he became aware that Stephens and Sherry had, in fact, been in Reed's building, but a supervisor was standing outside the door talking to someone and later entered the building; in the meantime, Stephens and Sherry sat in the corridor of Reed's building and although they saw her, they never spoke to her (Doc. 19-5, FDAH Tr. vol. 1, 215, Apr. 13, 2004; Doc. 28-4, Ex. D). Washington testified that although he eventually contacted everyone who had been identified as having information about Reed's complaint, he had not been able to do so prior to Reed's terminating her employment, which occurred on February 9, 2001, during a second meeting between Reed and Washington (*id.*, 216–19).

The circumstances surrounding the February 9, 2001 meeting are as follows. Prior to the meeting, Washington had discussed his investigation with Tom Krampota, Reed's supervisor (*id.*, 216). When Reed learned of this, she went to Washington's office and was quite upset (*id.*). Reed stated she had overheard Krampota talking to Derrick Robinson about the facts of the investigation (*id.*; Doc. 17, ¶ 32). Reed expressed that Krampota should not have talked to Derrick about the investigation because complaints were supposed to be confidential (*id.*). Washington told Reed he would investigate the matter (Doc. 19-5, FDAH Tr. vol. 1, 216, Apr. 13, 2004). Reed asked Washington to call Derrick to the office and discuss the matter (*id.*). Washington did so, and asked Derrick about the conversation with Krampota (*id.*, 217; Doc. 17, ¶ 32). Derrick reported that Krampota told him that Washington was conducting an investigation and would probably be calling some of the staff to his office, so Derrick should make himself available (Doc. 17, ¶ 32; Doc. 19-5, FDAH Tr. vol. 1, 217, Apr. 13, 2004). After Derrick left, Reed became very upset and demanded that Washington immediately call a meeting with "everyone" to resolve the matter (Doc. 17, ¶ 33; Doc. 19-5, FDAH Tr. vol. 1, 218, Apr. 13, 2004). Washington declined to hold a meeting in this manner due to the disruption it would cause to the workday at the college, as well as the fact that it was inconsistent with normal investigatory procedures (Doc. 17, ¶ 34; Doc. 19-5, FDAH Tr. vol. 1, 218, 239–41, Apr. 13, 2004). Washington told Reed that he was conducting an investigation, that he had already talked to some of the witnesses, that he would talk to the rest, and when he concluded the investigation, which would probably be in "a day or two," he would inform her of his conclusions (Doc. 17, ¶ 34; Doc. 19-5, FDAH Tr. vol. 1, 218, Apr. 13, 2004). Reed immediately announced that she was resigning (Doc. 17, ¶ 35; Doc. 19-5, FDAH Tr. vol. 1, 218, Apr. 13, 2004). She placed her radio on Washington's desk and left his office (Doc. 17, ¶ 35; Doc. 19-5, FDAH Tr. vol. 1, 218, Apr. 13, 2004). Reed returned to Washington's office minutes later and gave him her keys (Doc. 17, ¶ 35; Doc. 19-5, FDAH Tr. vol. 1, 218, Apr. 13, 2004). Washington asked her if she wanted to wait until he concluded his investigation, but Reed did not reply and walked out of the office (Doc. 17, ¶ 35; Doc. 19-5, FDAH Tr. vol. 1, 218, Apr. 13, 2004).

After Reed resigned, Washington continued his investigation (Doc. 17, ¶ 37; Doc. 19-5, FDAH Tr. vol. 1, 219, Apr. 13, 2004). Washington determined that with regard to Reed's complaint of Stephens' being in her building unsupervised on December 23, 2000, Stephens had been assigned

to lock the buildings on campus, and Reed was not supposed to be on duty at that time (Doc. 17, ¶ 37; Doc. 19-5, FDAH Tr. vol. 1, 220–24, Apr. 13, 2004). Washington concluded that if any contact occurred between Stephens and Reed, it would have been purely incidental and not in violation of the "last chance" agreement (Doc. 17, ¶ 38; Doc. 19-6, FDAH Tr. vol. 1, 226, Apr. 13, 2004). The investigation was closed without any action taken against Stephens (Doc. 17, ¶ 40; Doc. 19-6, FDAH Tr. vol. 1, 224, Apr. 13, 2004).

As mentioned *supra* (*see* footnote 3), Reed "dual filed" an Amended Charge of Discrimination ("Amended Charge") with the FCHR and the EEOC alleging sexual harassment by a co-worker while working at GCCC, in violation of both Title VII and the Florida Civil Rights Act, Fla. Stat. § 760.11 *et seq*. (Doc. 17, ¶ 2; Doc. 19-8, Ex. E; Doc. 27, ¶ 18; *see also* Doc. 28-1, Ex. A at 40–48). The EEOC deferred investigation and initial processing of the Amended Charge to the FCHR (Doc. 17, ¶ 2; Doc. 19-9, Ex. F). On January 4, 2004, the FCHR issued a written determination that there was no reasonable cause to believe that an unlawful employment practice occurred (Doc. 17, ¶ 3; Doc. 19-10, Ex. G). Reed filed a Petition for Relief from an Unlawful Employment Practice, thereby appealing the FCHR's determination (Doc. 17, ¶ 3). Following an evidentiary hearing before an administrative law judge ("ALJ"), the ALJ issued a Recommended Order on May 20, 2004, recommending that Reed's complaint be dismissed because it was untimely filed with the FCHR under the Florida Civil Rights Act, and Reed failed to show a prima facie case of discrimination (Doc. 17, ¶¶ 6–8; Doc. 19-2, Ex. B). The FCHR wholly adopted the ALJ's findings of fact and conclusions of law and dismissed Reed's Petition on August 4, 2004 (Doc. 17, ¶ 9; Doc. 19-1, Ex. A; Doc. 27, ¶ 19). The FCHR's Final Order notified Reed of her right to request a "substantial weight review" by the EEOC by sending a written request to the Miami District Office of the EEOC within fifteen (15) days of her receipt of the Final Order (Doc. 19-1, Ex. A). Reed filed a written request for review on August 18, 2004, which was received by the EEOC the next day (Doc. 27, ¶ 20; Doc. 28-4, Ex. P). On January 26, 2005, the EEOC issued a Dismissal and Notice of Rights, adopting the FCHR's findings and closing its file (Doc. 17, ¶ 42; Doc. 19-11, Ex. H). At the request of Reed's attorney, Cecile Scoon, Esq. (Ms. Scoon is not representing Reed in the instant case), the EEOC issued another right-to-sue letter on March 13, 2008. Reed filed her complaint in the instant case on June 16, 2008, although a summons was not issued until nearly one year later on

June 20, 2009 (Doc. 27, ¶ 23; Doc. 28-4, Ex. S). Defendant was served with process on June 22, 2009, and filed a notice of removal to this federal court on July 13, 2009 (Doc. 2).

IV.    LEGAL STANDARDS

    A.    Summary Judgment Standard

In order to prevail on its motion for summary judgment, GCCC must show that Reed has no evidence to support her case or present affirmative evidence that Reed will be unable to prove her case at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). If GCCC successfully negates an essential element of Reed's case, the burden shifts to Reed to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* Reed must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. Celotex Corp., 477 U. S. at 324 (quoting Fed. R. Civ. P. 56(e)). Reed must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleading and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting Celotex Corp., 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c), (e))); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Reed in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to her. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, Reed still bears the burden

of coming forward with sufficient evidence of every element that she must prove. <u>Celotex Corp.</u>, 477 U.S. 317 (1986). A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp.</u>, 477 U.S. at 322.

      B.     <u>Title VII Standard</u>

     In order to establish a prima facie case of hostile work environment, a plaintiff must prove:

> (1) that [she] belongs to a protected group; (2) that [she] has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

<u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002). To establish hostile work environment, plaintiffs like Reed must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [their] employment." <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 133, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004) (citing <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986); <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

     The United States Supreme Court has commented that the "severe or pervasive" inquiry is "crucial" and that neither judges nor juries should mistake "ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation—for discriminatory conditions of employment." <u>Onacle v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) (internal quotations omitted). The Court's test is disjunctive, *see* <u>Suder</u>, 542 U.S. at 133; <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), and either element provides an independent ground for finding a hostile work environment. *See* <u>Jensen v. Potter</u>, 435 F.3d 444 (3d Cir. 2006); <u>Harvill v. Westward Communications, LLC</u>, 433 F.3d 428, 434–35 (5th Cir. 2005); <u>Hostetler v. Quality Dining, Inc.</u>, 218 F.3d 798, 808 (7th Cir. 2000); <u>Witt v. Roadway Express</u>, 136 F.3d 1424, 1432 (10th Cir. 1998). In addition, "[e]stablishing that harassing conduct is sufficiently severe or pervasive to alter an

employee's terms or conditions of employment includes a subjective and an objective component." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21–22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)); *see also* Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000).

As to the subjective component, the employee must "subjectively perceive" the harassing behavior as being sufficiently severe or pervasive to alter the terms or conditions of her employment. *See* Mendoza, 195 F.3d at 1246 (citing Harris, 510 U.S. at 21–22, 114 S. Ct. 367, 126 L. Ed. 2d 295). This subjective perception, however, must be objectively reasonable. *See id.* The objective component involves a fact intensive inquiry; "[t]he [work] environment must be one that a reasonable person would find hostile or abusive, [which] should be judged from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances." *Id.* (quoting Onacle v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). The Supreme Court has identified four factors that courts should consider when evaluating the objective reasonableness of the alleged harassment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* "[District] courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id.*

In hostile environment-constructive discharge cases, however, something more than severe or pervasive harassment is required: "A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Suders, 542 U.S. at 146–47 (citing Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1160 (8th Cir. 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress."); *see also* Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir.

2009) (a plaintiff claiming constructive discharge must show "a greater severity or pervasiveness of harassment" such that resignation is the only reasonable response, which is a more onerous task than establishing a simple hostile work environment claim); Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208 (11th Cir. 2001) (unlike a hostile work environment claim, which considers a plaintiff's subjective feelings and objective factors, a constructive discharge claim involves only an objective standard). The mere fact that a working environment becomes less attractive to the employee does not make the environment objectively intolerable. Hipp, 252 F.3d at 1235. A constructive discharge claim does not present a jury issue "unless a plaintiff produces substantial evidence that conditions were intolerable." See Brochu v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002).

Relevant, and perhaps critical, to the court's analysis of an employee's constructive discharge claim is whether the employer took reasonable steps to respond to the employee's complaints about harassment. See Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001) (noting, in granting summary judgment on a constructive discharge claim, that the employer had taken immediate steps to address the underlying situation before the employee resigned); see also Coppinger v. Wal-Mart Stores, Inc., No. 3:07cv458/MCR/MD, 2009 WL 3163211, at *9–10 (N.D. Fla. Sept. 30, 2009) (noting in the same context that the employer had "t[aken] reasonable steps to assuage [the employee's] subjective perception of the situation" prior to the employee leaving).

In cases involving a hostile work environment claim, as a separate claim or as a compound claim of hostile work environment-constructive discharge, the employer may have an affirmative defense, known as the Ellerth-Faragher [5] defense, available to it. Suders, 542 U.S. at 124, 148–49. The Ellerth-Faragher defense has two elements: "(1) that [the employer] had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." Id. The Ellerth-Faragher defense will not be available to the employer, however, if the employee suffered a tangible employment action, which the Supreme Court defines

---

[5] Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 748–49, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) and Faragher v. Boca Raton, 524 U.S. 775, 783, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761.

A constructive discharge does not always qualify as a tangible employment action. As the Supreme Court explained in Suders,

> harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts. Unlike an actual termination, which is always effected through an official act of the company, a constructive discharge need not be. A constructive discharge involves both an employee's decision to leave and precipitating conduct: The former involves no official action; the latter, like a harassment claim without any constructive discharge assertion, may or may not involve official action.

542 U.S. at 148. The Court held that only constructive discharges that are precipitated by an official act qualify as tangible employment actions; if "an official act does not underlie the constructive discharge, the Ellerth and Faragher analysis . . . calls for extension of the affirmative defense to the employer." Id.

V.    DISCUSSION

GCCC argues that the conduct complained of by Reed was insufficient to constitute severe or pervasive harassment, and no reasonable person in her position would have felt compelled to resign (Doc. 18 at 7–10). GCCC additionally contends the evidence establishes its entitlement to the Ellerth-Faragher affirmative defense; therefore, no basis exists for holding it liable (id. at 10–16).

A.    Severity or Pervasiveness of the Alleged Sexual Harassment

GCCC contends the conduct alleged by Reed, that is, Stephens' taking unauthorized photographs of her, being in her presence without a supervisor present, talking about her, and looking at her with his mouth open, does not rise to the level of severe or pervasive (Doc. 18 at 7–8).[6] GCCC additionally contends Reed's allegations are insufficient to establish that she was

---

[6] The court notes that included in the summary judgment record is testimony from an administrative hearing in which Reed questioned witness Shirley Walker about whether Walker saw Stephens put his hand in Reed's pants, and Reed questioned Brenda Taylor about whether Taylor saw Stephens hit her (Doc. 19-3, Ex. C, FDAH Tr. vol. 1, 112, 114–17; Doc. 28-4, Ex. E). Each witness testified she did not observe such conduct (id.). Reed has not produced any evidence, admissible under Rule 56, of any touching by Stephens, nor has she produced any evidence that she ever notified a supervisor of such conduct or included it in either of her sexual harassment complaints with GCCC in 1999 or 2001. Indeed, Reed does not dispute GCCC's statement, in its statement of undisputed material facts, that she never

constructively discharged (Doc. 18 at 9). GCCC argues Reed has not identified any adverse employment action taken against her or any serious or material change in the terms, conditions or privileges of her employment (*id.*). Additionally, GCCC argues that its reactions to Reed's complaints were reasonable and did not create an intolerable workplace (*id.*).

In opposition to the motion for summary judgment, Reed submitted her Amended Charge of Discrimination, sworn under penalty of perjury, in which she describes Stephens' harassing conduct as follows:

> For months he took unauthorized pictures of me as I ate, bended over, cleaned the bathroom, etc. I repeatedly complained to him and management. Finally I was told that he was not allowed to come to my building. I later learned that he was authorized to come as long as he was supervised. However, he continued to return to my building unsupervised, giving me lewd looks and making arrogant comments to his co-workers. Due to the hostile work environment, I resigned.

(Doc. 27, ¶ 18; Doc. 28-1, Ex. A at 16). As additional evidence that Stephens' conduct was severe or pervasive, Reed submitted the memorandum from John Holdnak to John Morris, dated September 10, 1999 (referenced in the Material Facts section, *supra*) (Doc. 17, ¶ 9). In the memorandum, Holdnak states Stephens admitted to him that he took "multiple pictures of Ms. Reed, on campus, during working hours, without her permission, over an extended period of time." (Doc. 28-2, Doc. A at 120–21). Holdnak states, "Mr. Stephens used a grand master key to gain access to the building Ms. Reed was working in, after she had secured the doors from public access. This resulted in several situations where Ms. Reed was 'surprised' by Mr. Stephens and his camera when she thought the building was secure." (*id.*). Holdnak further states, "We have been able to confirm the essential components of Ms. Reed's complaint against Mr. Stephens. It is our opinion that Mr. Stephens did, over a considerable period of time, create a hostile working environment for Ms. Reed." (*id.*). The undersigned concludes that, viewing the evidence in the light most favorable to Reed, Reed has presented sufficient evidence to survive summary judgment on the "severity or pervasiveness" element, to the extent she asserts a claim of sexual harassment separate from her compound claim of sexual harassment-constructive discharge.

---

alleged that Stephens made inappropriate advances towards her, touched her, or had physical contact with her from the time of her initial complaint through her resignation (Doc. 17, ¶ 22).

However, the undersigned concludes that Reed has failed to come forward with sufficient evidence to meet the constructive discharge standard, that is, that her working conditions were so onerous that a reasonable person in her position would have been compelled to resign. Reed argues that GCCC's inability to control Stephens' behavior or protect her from him, as well as GCCC's failure to act on her complaints, caused her such emotional distress and anguish that she felt she had no choice but to resign (Doc. 26, ¶¶ 5–7). She contends GCCC's response to her first complaint about Stephens' picture-taking in 1999 was inadequate, in light of a similar sexual harassment complaint against Stephens in 1993 and Stephens' failure to comply with the condition imposed by management in 1993 that he not bring a camera to campus (Doc. 26, ¶7; Doc. 27, ¶¶ 2, 6–8). Reed additionally contends her supervisors failed to respond to her complaints about Stephens' violating the "last chance" agreement by being present in her building without a supervisor (Doc. 27, ¶¶ 3, 4, 11). She states GCCC's failure to properly investigate her complaints and failure to take effective remedial action caused her such emotional distress and anguish that she resigned to maintain her sanity (Doc. 26, ¶¶ 5–7; Doc. 27, ¶ 3).

Reed's subjective belief as to the adequacy of GCCC's actions is immaterial in the constructive discharge analysis. Rowell v. Bell-South Corp., 433 F.3d 794, 806 (11th Cir. 2005). Moreover, viewing the evidence in the light most favorable to Reed, no reasonable juror could find that GCCC's response to her 1999 complaint was so inadequate and her working conditions after the formal disciplinary action in 1999 so onerous that a reasonable person in Reed's position would have been compelled to resign. The summary judgment record establishes that in response to Reed's 1999 complaint, GCCC did not merely impose the same sanction as in the 1993 picture-taking incident involving Stephens. The 1999 sanctions were much more severe. Whereas in 1993 GCCC did not take formal disciplinary action against Stephens, the college took formal action in response to Reed's complaint, including a demotion and loss of pay, placement on probation for one year, restrictions on contact with Reed, a prohibition on bringing a camera to campus, and his agreement that he could face termination if he failed to follow the conditions of his employment. A reasonable person would have recognized that GCCC's punishment of Stephens in 1999 was much more aggressive than that in 1993. Despite Reed's knowledge that the Human Resources department would investigate complaints of harassment when she brought such complaints to that department,

as evidenced by Holdnak's testimony that Reed brought two complaints to him in 1999 and another complaint in 2001, via the college President; Reed never made subsequent complaints of harassing conduct by Stephens to anyone in her chain of command until February of 2001. William (Bill) Barker, Stephens' replacement as lead custodian, testified that Reed never complained to him about conduct or remarks from Stephens (Doc. 19-4, Ex. C, FDAH Tr. vol. 1, 146–47, Apr. 13, 2004). Tom Krampota, custodian supervisor, testified that after Stephens was formally disciplined, Reed never discussed with him any issues concerning Stephens' failure to adhere to the terms of the "last chance" agreement (Doc. 19-3, Ex. C, FDAH Tr. vol. 1, 121–22, Apr. 13, 2004). Mosell Washington testified that prior to February of 2001, Reed never complained to him about Stephens (Doc. 19-5, FDAH Tr. vol. 1, 210, Apr. 13, 2004). John Holdnak testified that from 1999 to February of 2001, Reed never came to him or attempted to come to him with complaints about Stephens (Doc. 19-5, Ex. C, FDAH Tr. vol. 1, 193–95, Apr. 13, 2004).

Reed argues that prior to her complaint to the college President in February of 2001, she had reported additional sexual harassment by Stephens, but no action was taken (*see* Doc. 27, ¶¶ 3, 4, 11). Upon review of the record, however, Reed has not submitted any admissible evidence demonstrating that she made such complaints to anyone besides her co-workers.[7] Furthermore, when Reed did make a complaint in February of 2001, GCCC immediately responded by initiating an investigation, but Reed resigned her position before that investigation could be concluded. A reasonable juror could not conclude Reed was constructively discharged, given her admitted failure to give GCCC a chance to address the situation. *See* Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) ("Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast.").

Moreover, while Reed argues that supervisors permitted Stephens to be in her building unsupervised, and the evidence shows that Washington's investigation revealed two instances where Stephens was in Reed's building without a supervisor present (the December 23, 2000 incident when Stephens was instructed to lock the buildings before the holiday break, and the January 24, 2001

---

[7] Butch Whitehead is not in Reed or Stephens' chain of command (Doc. 19-5, FDAH Tr. vol. 1, 209, Apr. 13, 2004).

incident where Stephens and Mr. Sherry were sent to Reed's building), the evidence viewed in the light most favorable to Reed shows that their simultaneous presence without a supervisor was purely by chance. Reed's presence in her building when Stephens appeared there on December 23 was unanticipated because the custodial staff, including Reed, had previously been released from duty by their supervisors because of the holiday (Doc. 17, ¶ 37).[8] With regard to the January of 2001 incident, the evidence submitted by Reed shows that a supervisor was present just minutes after Stephens and Sherry arrived at the building (Doc. 28-4, Ex. D). Moreover, the evidence shows that after Reed announced her resignation, Mosell Washington asked her to stay until his investigation concluded, but Reed refused.

All in all, Reed has failed to raise a genuine issue concerning whether her working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign. Courts have refused to find constructive discharge under similar or more adverse circumstances than those here. *See, e.g.*, Hipp, 252 F.3d at 1231 (finding that being told one is doing a "terrible" and "lousy job" not enough for constructive discharge); Fitz, 348 F.3d at 978 (holding in an age discrimination setting that being berated and told that management planned to fire one are insufficient); Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316–18 (11th Cir. 1989) (affirming district court's finding that female employees established that they were subjected to a hostile work environment, based upon supervisor's sexually-oriented joking with employees, requesting sexual favors, commenting on employees' attire in a suggestive manner, and asking them to visit him on the couch in his office; however, employees were not constructively discharged because they alleged only one incident of harassment after meeting between employee, harassing supervisor, and employer's EEOC officer); Washington v. Kroger Co., 218 Fed. Appx. 822, 827, 2007 WL 433519, at *5 (11th Cir. 2007) (unpublished) (African American former employee failed to establish that his working conditions were so intolerable that a reasonable person would have been compelled to resign, as was required to show constructive discharge; harassment experienced by employee only occurred during three-month period, employer addressed complaints following incident, employee continued to work with sole person who allegedly harassed him for only 20 more days, employer had a legitimate

---

[8] Reed did not controvert this fact in her statement of facts.

reason for transferring employee, and his job title as store clerk remained the same after transfer); Van Der Meulen v. Brinker Intern., 153 Fed. Appx. 649, 656–57, 2005 WL 2847252, at **7–8 (11th Cir. 2005) (unpublished) (female employee was not constructively discharged as result of one incident of sexual harassment by supervisor, and alleged statement by manager that her promotional potential would be negatively affected if she reported the harassment, as would constitute adverse employment action for purpose of Title VII retaliation claim, where management had previously reprimanded supervisor and addressed other harassment complaints against him, employee quit before management had opportunity to address employee's complaint, managers contacted employee and attempted to get employee to change her mind after she quit, and employee was never denied any promotion); Coppinger, 2009 WL 3163211, at *9–10 (employee failed to show disputed issue of material fact regarding constructive discharge claim where he failed to produce evidence of overt hostility or show that failure to promote him was discriminatory, and employer took reasonable steps to assuage employee's subjective perception of discrimination); Freese v. Wuesthoff Health System, Inc., No. 6:06-cv-175-Ord.-31JGG, 2006 WL 1382111, at *6 (M.D. Fla. May 19, 2006) (unpublished) (allegations of single threatening retaliatory comment, discipline and "harassment" which employee believed was unfair and unwarranted, increased workload, and failure to respond to her complaints simply do not establish existence of environment that was so intolerable that a reasonable person would have been forced to leave). In the absence of evidence from which a reasonable juror could find that Reed's working conditions were so onerous that a reasonable person would have felt compelled to resign, GCCC is entitled to summary judgment on Reed's compound claim of sexual harassment-constructive discharge.

In sum, the undersigned concludes that although Reed has submitted sufficient evidence from which a reasonable juror could find that she was subjected to a hostile work environment, she has failed to show a genuine issue of material fact as to whether she was constructively discharged, and the evidence is insufficient for a reasonable juror to find that she was constructively discharged.

B.      Basis for Holding GCCC Liable

It is unclear whether Reed asserts a hostile work environment claim separate from her compound claim involving constructive discharge. Liberally construing Reed's complaint as asserting a separate hostile work environment claim, and in light of the court's conclusion that a

reasonable juror could conclude that Reed has shown that the sexual harassment was sufficiently severe or pervasive, the court must next address whether the Ellerth-Faragher defense is available to GCCC. GCCC contends the affirmative defense is available because Reed has not identified any tangible employment action, and the evidence satisfies both elements of the defense (Doc. 18 at 11–16).

As previously mentioned, the Ellerth-Faragher defense is not available to the employer if the plaintiff quits "in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." Suders, 542 U.S. at 134. Absent an official act reflected in company records, however, the defense is available in sexual harassment-constructive discharge cases. *Id.* at 148–49.

The first issue is whether Reed suffered any tangible employment action. Reed does not allege, and there is no evidence to suggest, that she suffered any official change in her employment status or situation. Furthermore, in light of the court's determination that Reed failed to show she was constructively discharged, the alleged constructive discharge does not qualify as a tangible employment action. Therefore, Reed has failed to show a genuine issue of material fact with respect to whether any tangible employment action was taken against her. Accordingly, the Ellerth-Faragher defense is available to GCCC.

The remaining issue is whether GCCC has established both elements of the defense. An employer asserting a Ellerth-Faragher defense must show both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus. *See* Suder, 542 U.S. at 134. The employer bears the burden of demonstrating both elements of the defense by a preponderance of the evidence. Faragher, 524 at 807.

1.    Reasonable care to prevent and promptly correct sexual harassment

An employer exercises reasonable care to prevent sexual harassment when it promulgates and effectively disseminates to its employees an anti-harassment policy containing no fatal defects. Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296–97 (11th Cir. 2000) (citation omitted); Frederick, 246 F.3d at 1314. With respect to the "reasonable care to correct" element, the employer

need not respond instantaneously to a complaint of sexual harassment but rather reasonably promptly, <u>Frederick</u>, 246 F.3d at 1313–14; the Eleventh Circuit has "noted that the employer's notice of the harassment is of paramount importance [because] if the employer had notice of the harassment . . . then it is liable unless it took prompt corrective action." <u>Madray</u>, 208 F.3d at 1299 (quoting <u>Dees</u>, 168 F.3d at 422) (internal quotations omitted). "This inquiry is facilitated by the identification of the appropriate [c]ompany representative to whom employees should register their complaints in the [company's] sexual harassment policy." <u>Id.</u> at 1299–1300.

In this case, the undisputed evidence shows that GCCC had a clear, written policy against sexual harassment in place, which is published to employees each year by including a written brochure in materials distributed to employees at an annual meeting (Doc. 19-3, Ex. C, FDAH Tr. vol. 1, 195–96, Apr. 13, 2004; Doc. 19-12, Ex. I). The policy provides that employees should report sexual harassment complaints to their immediate supervisor, department head, human resources director, dean, or vice president of administrative services (Doc. 19-12, Ex. I). Reed does not dispute that she was aware of the procedure in place for reporting incidents of sexual harassment and making complaints about co-workers (Doc. 17, ¶ 23). Furthermore, Reed understood that if she brought any complaint to the Director of Human Resources, it would be investigated, as evidenced by Reed's and Holdnak's testimony that prior to Reed's lodging a complaint about Stephens' picture-taking in 1999, she brought Holdnak a complaint of racial discrimination involving another employee. Additionally, the undisputed evidence shows that upon Holdnak's discussing with Reed the formal disciplinary action that would be taken against Stephens, Holdnak specifically told Reed that Stephens had been told he could not contact her, and if she experienced such conduct by Stephens, she should contact him (Holdnak) or Mosell Washington (Doc. 19-5, FDAH Tr. vol. 1, 194, Apr. 13, 2004). The undersigned thus concludes that GCCC has established that it exercised reasonable care to prevent harassment through its promulgation and effective dissemination of its anti-harassment policy and complaint procedures.

Next, the court considers whether GCCC acted promptly to correct the complained-of sexual harassment. GCCC contends it promptly and thoroughly investigated Reed's complaint of Stephens' unauthorized picture-taking, as evidenced by Mr. Holdnak's testimony that he interviewed all of the people who Reed indicated had knowledge of her allegations, including Stephens (Doc. 19-4, Ex.

C, FDAH Tr. vol. 1, 188, Apr. 13, 2004). Additionally, Holdnak asked Stephens to deliver to him the pictures he took of Reed, and he viewed those pictures (*id.*). At the conclusion of his investigation, Holdnak recommended reasonable corrective action in the form of formal disciplinary action against Stephens, and his recommendation was approved by the Vice President of Administrative Services and the President of GCCC (*id.*, 191). After Mr. Stephens was disciplined, Mr. Holdnak described to Reed the disciplinary action taken against Stephens, and Reed expressed her satisfaction.

Reed contends the investigation of her complaint involved nothing more than Holdnak's "negotiating" with her and attempting to appease her with some sort of disciplinary action against Stephens (Doc. 26, ¶ 7; Doc. 27, ¶ 6). As evidence in support of her position, Reed submitted memoranda and logs of activities of Holdnak and Washington, describing their investigations of Reed's complaints and recommending what action, if any, should be taken (Doc. 28-2, Ex. A at 120–21, 124–27, 172–76, 179–80). Reed also appears to contend that the formal disciplinary action against Stephens was inadequate, based the evidence of the previous sexual harassment complaint made by students against Stephens in 1993, which was referenced and enclosed in Holdnak's memorandum (Doc. 28-2, Ex. A at 120, 137–41). Reed additionally argues her supervisors permitted Stephens to come to her building unsupervised and failed to take action when she complained about it.

Viewing the facts in the light most favorable to Reed, the undersigned concludes that Reed has failed to demonstrate a genuine issue of material fact as to whether GCCC "exercised reasonable care . . . [to] correct promptly" any sexually harassing behavior by Stephens. The evidence submitted by Reed, especially the memoranda and logs of activities of Holdnak and Washington, show prompt and thorough investigations of her complaints in September of 1999 and February of 2001, which are the only two complaints she made.[9] Additionally, Reed has failed to show a genuine issue of material fact as to whether the action taken by GCCC on each of her complaints was reasonable. In determining the corrective action to take on Reed's picture-taking complaint,

---

[9] As previously noted, Reed has not submitted any admissible evidence that she complained to anyone besides her co-workers between September of 1999 and February of 2001.

Holdnak considered Stephens' history with the college, the nature of Stephens' conduct, and Reed's desired outcome, that is, that Stephens stay away from her. The formal disciplinary action taken against Stephens and the conditions imposed upon his employment was a reasonable response to Reed's complaint, and no reasonable juror could find otherwise. With regard to Reed's subsequent complaint of Stephens' alleged violations of the "last chance" agreement, the undisputed evidence shows that Stephens' unsupervised presence in Reed's building was purely by chance, as discussed *supra*, and Reed has failed to submit admissible evidence of any other violations of the agreement or harassing conduct by Stephens or her supervisors. Therefore, GCCC has satisfied the first element of the established Ellerth-Faragher defense, that is, that GCCC had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment.

> 2. Unreasonable failure to take advantage of preventive or corrective opportunities provided by employer to avoid harm otherwise

The second element of the Ellerth-Faragher affirmative defense requires the employer to prove not only that the employee failed to avail herself of the employer's sexual harassment policy but also that such failure was unreasonable.

GCCC contends that after it took formal disciplinary action against Stephens, Reed failed to take advantage of the college's sexual harassment policy (Doc. 18 at 12). GCCC argues that despite Plaintiff's awareness of the procedure in place for reporting sexual harassment, she failed to report any such conduct to a person in her chain of command until February 5, 2001, as evidenced by testimony from Bill Barker, Tom Krampota, Mosell Washington, and John Holdnak (*id.* at 12–15). Further, when Reed made her complaint on February 5, 2001, GCCC immediately initiated an investigation, as evidenced by Washington's testimony, but Reed resigned prior to conclusion of the investigation because Washington refused her demand for a group meeting of the custodial staff (*id.* at 15–16). GCCC thus contends it has established the second prong of the Ellerth-Faragher affirmative defense.

Reed contends there is a genuine issue of material fact as to whether she failed to avail herself of GCCC's sexual harassment policy. She contends she made complaints, but no action was taken, so she resigned.

As discussed *supra*, Reed has not submitted any admissible evidence that she made such complaints to anyone besides her co-workers until February of 2001. When she made her complaint in February of 2001, GCCC immediately responded by initiating an investigation. Reed resigned her position on February 9, 2001, before that investigation could be concluded. Mosell Washington, the Director of Human Resources and lead investigator, asked Reed if she wanted to wait until he concluded the investigation, but she did not reply and walked out of his office. Viewing the evidence in the light most favorable to Reed, the undersigned concludes that Reed has failed to demonstrate a genuine issue of material fact as to whether she failed to avail herself of GCCC's sexual harassment policy; her resignation prior to conclusion of the investigation constitutes such a failure. Furthermore, there is insufficient evidence from which a reasonable juror could conclude that Reed's resignation was reasonable, especially in light of the fact that the previous investigation in 1999 concluded favorably to her (her allegations were deemed substantiated and formal disciplinary action, satisfactory to Reed, was taken against Stephens).

GCCC submitted evidence satisfying both elements of the Ellerth-Faragher defense, and Reed has failed to submit sufficient evidence from which a reasonable juror could conclude that either element was not satisfied. Therefore, liberally construing Reed's complaint as asserting a separate hostile work environment claim, the court concludes that GCCC is entitled to summary judgment on the claim.

VI.    CONCLUSION

This court denies Defendant Gulf Coast Community College's motion to strike Reed's statement of undisputed material facts, notice of filing exhibit list, and response to Defendant's motion for summary judgment. Further, the undersigned concludes that GCCC is entitled to summary judgment on Reed's claims of sexual harassment and constructive discharge, which are the only claims asserted in her complaint. Therefore, GCCC's motion for summary judgment should be granted, and judgment should be entered in favor of GCCC.[10]

_____

[10] In light of the court's recommendation that GCCC's motion for summary judgment be granted on the merits of Reed's Title VII claims, the court need not address GCCC's alternative grounds for its motion, that is untimeliness of Reed's EEOC complaint and the instant lawsuit. *See* Myers v. Central Florida Investments, Inc., 592 F.3d 1201, 1223–24 (11th Cir. 2010) (filing of timely charge of discrimination with EEOC is not jurisdictional prerequisite to suit in federal court, but requirement that, like statute of limitations, is subject to waiver, estoppel, and equitable tolling)

Accordingly, it is **ORDERED**:

Defendant GCCC's motion to strike Plaintiff Reed's statement of undisputed material facts,
notice of filing exhibit list, and response to Defendant's motion for summary judgment (Doc. 30)
is **DENIED**.

And it is respectfully **RECOMMENDED**:

1.      That Defendant's motion for summary judgment (Doc. 16) be **GRANTED**.

2.      That judgment be entered in favor of Defendant Gulf Coast Community College.

At Pensacola, Florida this 29<u>th</u> day of June 2010.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within
fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear
on the electronic docket is for the court's internal use only and does not control.</u> A copy of
objections shall be served upon the magistrate judge and all other parties. Failure to object
may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States
v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**

---

(citing <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)); <u>Bryant v. U.S.
Dept. of Agriculture</u>, 967 F.2d 501, 504 (11th Cir .1992) (statutory period for filing Title VII action "is not jurisdictional
but is akin to a statute of limitations and is subject to equitable tolling."); <u>Fouche v. Jekyll Island State Park Authority</u>,
713 F.2d 1518, 1525 (11th Cir. 1983) ("[A]ll Title VII procedural requirements to suit are henceforth to be viewed as
conditions precedent to suit rather than as jurisdictional requirements.").